## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **CHRISTINE DIPAOLA,** | * | |
| **Plaintiff,** | * | |
| **v.** | * | **Civ. No. JKB-24-1616** |
| **ARAMARK CORRECTIONAL SERVICES, LLC, et al.,** | * | |
| | * | |
| **Defendants.** | * | |
| | * | |

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

### MEMORANDUM

Plaintiff Christine DiPaola sued Aramark Correctional Services, LLC ("Aramark") and Cecil County, Maryland ("County") on various claims arising out of her employment in the kitchen of the Cecil County Detention Center ("CCDC").[1] (*See* ECF No. 1-1.)

Pending before the Court is the County's Motion to Dismiss. (*See* ECF No. 14.) The Motion is fully briefed, and no hearing is required. *See* Local Rule 105.6 (D. Md. 2023). For the reasons set forth below, the Motion will be granted in part and denied in part.[2]

## I.     FACTUAL BACKGROUND

As relevant to the pending Motion, DiPaola alleges that she is a food-service professional with many years of experience in the industry. (ECF No. 1-1 at ¶ 3.) In early December 2019, she was hired by Aramark to serve as a Food Services Supervisor for Aramark's CCDC operation.

---

[1] In its Answer, Aramark asserts that DiPaola sued the wrong corporate entity. (ECF No. 16 at 1 n.1 ("Aramark Services, Inc. is the corporate entity that employed Plaintiff and, thus, is improperly named in the Complaint as Aramark Correctional Services, LLC.").) DiPaola acknowledges this potential mistake in a subsequent filing. (*See* ECF No. 17 at 2 n.1.) No party has filed a motion on this issue. Accordingly, and until this issue is resolved, all references to "Aramark" refer to the Aramark-affiliated, non-County defendant.

[2] An unbriefed but otherwise indistinguishable motion was docketed on June 7, 2024. (*See* ECF No. 8). The County had originally filed that motion in state court, shortly before Defendants removed to this Court. Because that motion is identical to the one the Court resolves today, *see* Local Rule 103.5(a)–(b), it will be denied as moot.

(*Id.* at ¶ 14.)  She was drawn to the position in large part because of its proximity to her residence, (*id.* at ¶ 15)—something she claims to have told Aramark during the hiring process, (*id.* at ¶ 16.)

According to DiPaola, Aramark operates at the CCDC through a contract with the County. (ECF No. 1-1 at ¶ 20.)  This contract gives Aramark the responsibility of staffing the CCDC's kitchen facilities.  (*Id.* at ¶ 21.)  The employees Aramark places at the CCDC are also "paid by Defendant Aramark and are supervised by Aramark to varying degrees." (*Id.* at ¶ 22.)

"However," DiPaola adds, all Aramark employees at the CCDC are separately "required to follow the direction of the County's employees." (ECF No. 1-1 at ¶ 23.)  She alleges that, during her tenure, her own "day-to-day activities and tasks were almost exclusively dictated by the County, wh[ich] maintained control over the conditions of her employment."  (*Id.* at ¶ 24.)  She further asserts that Aramark "shared necessary personnel records with the County, including information about an employee's absences and need for medical accommodations."  (*Id.* at ¶ 25.)

DiPaola believes she "consistently excelled in her position as Food Services Supervisor," as demonstrated by "exemplary feedback and evaluations" from her supervisor, the facility's Food Services Director.  (ECF No. 1-1 at ¶¶ 26–27.)  When that supervisor later sought to be reassigned to a different location, DiPaola claims he suggested she was the proper candidate to replace him. (*See id.* at ¶ 27.)  In June 2020, following the supervisor's departure, DiPaola was promoted instead to the position of Food Services Manager.  (*See id.* at ¶¶ 30, 36, 38.)

DiPaola believes she "thrived" in her new role.  (*See* ECF No. 1-1 at ¶¶ 42–44.)  It was during this period, she asserts, that Aramark's CCDC account "became profitable for the first time over the many years the company serviced the facility."  (*Id.* at ¶ 45.)  In July 2021, DiPaola's salary was increased to $51,090—an over-$5,500 bump she believes was intended to reward her performance.  (*See id.* at ¶¶ 31, 46.)

2

In late September 2021, DiPaola "suffered a medical emergency while at work." (ECF No. 1-1 at ¶ 52.) She immediately began taking medical leave. (*Id.* at ¶ 96.) DiPaola's condition "severely limited [her] major life activities, including her ability to lift objects, travel even short distances, engage in exercise, including walking, and work." (*Id.* at ¶ 56.) She claims to have provided Aramark with "all necessary medical documentation regarding her disability and serious health condition," (*id.* at ¶ 58), and contends that, in response, Aramark classified her medical leave "as protected under the [Family and Medical Leave Act ("FMLA")]," (*id.* at ¶ 59). In November 2021, DiPaola was formally diagnosed with cervical disc disease, the treatment of which required "extensive surgery and subsequent recovery." (*Id.* at ¶ 55.) She underwent spinal surgery shortly thereafter. (*Id.* at ¶ 62.)

In the months that followed, DiPaola claims to have "repeatedly made clear to Defendant Aramark that she intended to return to the CCDC once she had recovered" from her operation. (ECF No. 1-1 at ¶ 62.) She also alleges that, between September 2021 and April 2022, Aramark "shared information with the County about Ms. DiPaola's medical condition, ongoing recovery, and anticipated return to work in the spring of 2022." (*Id.* at ¶ 61.)

Nevertheless, in January 2022, Aramark began to search for a new employee for its CCDC operation. (ECF No. 1-1 at ¶¶ 66–67.) Although the posting was for a Food Services Director, a position higher than DiPaola's, DiPaola believes Aramark sought the new employee specifically to replace her. (*Id.* at ¶¶ 70–71.) Aramark eventually filled the position. (*Id.* at ¶ 68.)

In early April 2022, DiPaola contacted Aramark to plan for her return to work the following week. (*See* ECF No. 1-1 at ¶¶ 37, 76.) Aramark then informed DiPaola that she was unlikely to reassume her position—at least, not at the CCDC. (*Id.* at ¶ 77.) Instead, Aramark "suggested she consider taking a Food Services Manager position at other prison facilities." (*Id.* at ¶ 79.) According to DiPaola, these locations were all "significantly f[a]rther away" from her residence

3

than was her position at the CCDC, adding roughly 30 to 40 miles each way to her commute. (*Id.* at ¶¶ 15, 81–83.) She also alleges that the $45,500 salary for these positions was lower than what she was making at the time, (*id.* at ¶ 80)—specifically, a reversion to the amount she made upon her initial promotion to Food Services Manager, (*see id.* at ¶¶ 31, 38), without the $5,500 raise she had received the previous summer, (*id.* at ¶ 46; *see also id.* at ¶ 170).

DiPaola claims she returned to the CCDC on April 14, 2022, only for Aramark to insist again that she "choose a lower paid position at an alternative county prison." (ECF No. 1-1 at ¶ 85.) Over the next week, she "continued to request that she be permitted to return to the CCDC." (*Id.* at ¶ 86.) She also lodged a complaint with Aramark's human resources department, contending that the company was discriminating against her because of her medical absence. (*See id.* at ¶ 87.)

"[F]ollowing this protected activity," DiPaola explains, Aramark "approached employees of the County to create a paper trail suggesting the County did not want Ms. DiPaola to return to work." (ECF No. 1-1 at ¶ 88.) In DiPaola's telling, Aramark "hoped to avoid liability for failing to restore Ms. DiPaola's employment by ostensibly basing its decision on the County's preference with respect to personnel Defendant Aramark posted at the CCDC." (*Id.* at ¶ 89.) Given what she alleges was Aramark's practice of sharing information with the County, DiPaola believes the County "was aware at all relevant times that she was on FMLA leave." (*Id.* at ¶ 90; *see also id.* at ¶¶ 163–65, 181.)

In response to Aramark's alleged overtures, the County purportedly emailed Aramark on April 22, 2022, stating that the County was not seeking DiPaola's return to the CCDC given that "the kitchen has been operating better now than it ever has." (ECF No. 1-1 at ¶ 91.) DiPaola notes that this email was sent "weeks" after Aramark first notified DiPaola that she "likely would not return to the CCDC following her medical leave," (*id.* at ¶ 92), and "months" after Aramark "began

4

its recruiting efforts to secure a replacement" for her, (*id.* at ¶ 93). This, she argues, is evidence that Aramark and the County "unlawfully colluded to fabricate evidence through which Defendant Aramark hoped to justify its patent violations of applicable law on the preference of its government client." (*Id.* at ¶ 94; *see also id.* at ¶ 95.) In DiPaola's view, the County "knew that Ms. DiPaola was entitled to return to her position at the CCDC yet, on or around April 22, 2022, requested that Aramark not permit Ms. DiPaola's return to the facility." (*Id.* at ¶ 172.) She also believes the County's email was "disingenuous," given that she "was never subjected to disciplinary proceedings during her employment and instead consistently received strong evaluations and commendations during her tenure as Food Services Manager until her need for medical leave." (*Id.* at ¶ 96; *see also id.* at ¶ 173.)

In mid-May 2022, DiPaola resigned, "compelled" by what she describes as Defendants' "willful refusal to restore [her] employment or offer an equivalent position." (ECF No. 1-1 at ¶ 176; *see also id.* at ¶ 98.) In her view, Aramark and the County "intended to punish Ms. DiPaola for her need to take an extended leave of absence," as evinced by certain actions—like Aramark's search for a new employee—dating back to January 2022. (*Id.* at ¶ 183.)

DiPaola brings a total of eight claims against Aramark, two of which she also brings against the County. (*See* ECF No. 1-1 at ¶¶ 100–84.) Her claims against the County[3] allege two violations of the FMLA: (1) failure to restore DiPaola to her previous position or an equivalent following her use of leave protected by the FMLA (Count VII), and (2) retaliation against DiPaola after she exercised her rights under the same (Count VIII). (*Id.* at ¶¶ 98, 160–84); *see generally* 29 U.S.C. §§ 2601–54.

---

[3] For purposes of the present Motion, the Court does not consider DiPaola's claims against Aramark, nor does it recapitulate allegations relevant to those claims but not to claims against the County.

## II.     LEGAL STANDARD

When considering a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the Court must "accept as true all well-pleaded allegations and view the complaint in the light most favorable to the plaintiff." *Venkatraman v. REI Sys., Inc.*, 417 F.3d 418, 420 (4th Cir. 2005). To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 446 U.S. at 662. This is so even when the allegations underlying the claim are "doubtful in fact." *See Twombly*, 550 U.S. at 555.

## III.    ANALYSIS

The County offers three arguments for dismissal. First, it argues that it was not DiPaola's employer, at least not for purposes of the two claims against it. (*See* ECF No. 14-1 at 3.) Second, it argues that, even if it could be held liable for FMLA violations against DiPaola, the April 22 email does not support any theory of liability recognized by the FMLA. (*See id.*) Third, it argues that it is not the proper defendant in any event, asserting that the April 22 email underlying its purported violations was in fact sent by the Cecil County Sheriff's Office—a state office, not a county one. (*See id.* at 3–4.)

For the reasons set forth below, the Court will grant in part and deny in part the County's Motion. Specifically, the Court will dismiss DiPaola's failure-to-restore claim (Count VII) against the County, but it will not dismiss her retaliation claim (Count VIII).

### A.      Failure to Restore (Count VII)

The County asserts that DiPaola "clearly and repeatedly alleges that Aramark was [her] employer in all material respects." (ECF No. 14-1 at 3.) As to DiPaola's failure-to-restore claim,

6

the Court agrees.  Because DiPaola's pleadings do not permit a reasonable inference that the County was her primary employer, she cannot maintain a failure-to-restore claim against it.  The Court will grant the County's Motion with respect to that claim (Count VII).

1.    DiPaola Has Adequately Pled that the County, along with Aramark, Was Her Joint Employer.

DiPaola alleges that the County was her employer—specifically, one half of a joint employment venture with Aramark.  (*See* ECF No. 1-1 at ¶ 166.)  Control over an individual is the lodestar of any putative employer-employee relationship.  *See, e.g.*, *Garrett v. Phillips Mills, Inc.*, 721 F.2d 979, 982 (4th Cir. 1983).  This remains true in the context of joint employment, *see Butler v. Drive Auto. Indus. of Amer., Inc.*, 793 F.3d 404, 410 (4th Cir. 2015), including under the FMLA, *see* 29 C.F.R. § 825.106(a) (providing that joint employment "may" exist "[w]here two or more businesses exercise some control over the work or working conditions of [an] employee").[4]  For FMLA purposes, whether multiple entities exercise joint control over an employee "is not determined by the application of any single criterion"; rather, "the entire relationship is to be viewed in its totality."  *Id.* § 825.106(b)(1).

To ascertain joint control for purposes of several federal employment laws, including the FMLA, the courts in this Circuit employ a nine-factor "hybrid test."  *See Butler*, 793 F.3d at 414; *Payne v. Medstar Health, Inc.*, Civ. No. RDB-21-2841, 2022 WL 17584375, at *6 & n.3 (D. Md. Dec. 12, 2022).   The three "most important"—though not dispositive—*Butler* factors are (1) authority to hire and fire the individual; (2) day-to-day supervision of the individual, including employee discipline; and (3) whether the putative employer furnishes the relevant equipment and

---

[4] More specifically, if an employee "performs work which simultaneously benefits two or more employers," 29 C.F.R. § 825.106(a), a joint employment relationship for FMLA purposes "generally will be considered to exist" when, for instance, one employer "acts directly or indirectly in the interest of the other employer in relation to the employee," *id.* § 825.106(a)(2), or when both employers "are not completely dissociated with respect to the employee's employment and may be deemed to share control of the employee, directly or indirectly, because one employer controls, is controlled by, or is under common control with the other employer," *id.* § 825.106(a)(3).

premises. *Butler*, 793 F.3d at 414. Lesser factors are (4) possession and control over an individual's records, including payroll, insurance, and tax documents; (5) the duration of the putative employment; (6) whether the putative employer trained the individual; (7) the similarity of the individual's duties to those of an ordinary employee; (8) whether the individual is assigned solely to the putative employer; and (9) whether the parties intended to enter an employment relationship. *Id.*

DiPaola pleads several facts relevant to this inquiry. To start, she alleges that Aramark was responsible for staffing, paying, and supervising (to "varying degrees") the kitchen staff at the CCDC. (ECF No. 1-1 at ¶¶ 21–22.) By DiPaola's account, it was Aramark that hired her, (*id.* at ¶ 14), promoted her, (*id.* at ¶¶ 30, 35, 38), assigned her a raise, (*id.* at ¶ 46), discussed and approved her medical leave, (*id.* at ¶¶ 37, 53–54, 58–60), fielded complaints about her pay, (*id.* at ¶¶ 64, 87), sought to relocate her to a different facility, (*id.* at ¶¶ 77, 79, 85), and paid her salary throughout her tenure, (*id.* at ¶¶ 41, 46). She also claims to have "initially reported" to an Aramark employee, (*id.* at ¶ 17), and to have been "directl[ly] supervis[ed]" by another, (*id.* at ¶ 37).

As for the County, DiPaola asserts that Aramark held its authority only by virtue of the County's contract, which delegated certain responsibilities to Aramark. (*See* ECF No. 1-1 at ¶¶ 19–20.) She also maintains that the County carved out a significant supervisory role for itself, including "almost exclusive[]" authority over DiPaola's own "day-to-day activities and tasks." (*See id.* at ¶¶ 23–24.) These tasks included "serv[ing] as the primary on-site liaison between Defendant Aramark and the County with respect to food services." (*Id.* at ¶ 39.) Indeed, County employees were familiar enough with DiPaola's work to have offered her "commendations" on her performance. (*See id.* at ¶¶ 48–50.) The County was also kept apprised of "employee[s'] absences and need for medical accommodations," (*id.* at ¶ 25), including DiPaola's, (*id.* at ¶ 61).

And it was the County that purportedly acquiesced in devising a pretextual rationale for Aramark not to restore DiPaola to her position following her medical leave. (*Id.* at ¶¶ 88–95.)

These facts permit a reasonable inference that the County, along with Aramark, was DiPaola's joint employer. For one, taking DiPaola's allegations as true under Rule 12(b)(6), the County satisfies two of the "most important" *Butler* factors: it supervised nearly all of DiPaola's daily tasks, (*see* ECF No. 1-1 at ¶ 21), and it owned or otherwise controlled her work premises, (*see id.* at ¶¶ 14, 20). Several of the remaining factors also implicate the County. True enough, Aramark was the frontline custodian of DiPaola's personnel records—but it always shared those records with the County. (*See id.* at ¶¶ 25, 61.) Given the nature of the alleged joint employment relationship, DiPaola worked for the County exactly as long as she worked for Aramark. (*See id.* at ¶¶ 14, 176.) And DiPaola was assigned to a workplace where she reported, in some capacity, to employees of both Aramark and the County. (*See id.* at ¶¶ 17, 19, 24, 37.) Under *Butler*, these allegations reach a critical mass by satisfying five of the overall nine factors, including two of the three most important. DiPaola has thus adequately pled the County's joint-employer status.

### 2. DiPaola Has Not Adequately Pled that the County Was Her *Primary* Employer.

All joint employment relationships under the FMLA consist of one "primary" employer and at least one "secondary" employer. *See* 29 C.F.R. § 825.106(c)–(e). Their duties differ in important respects. For instance, "only the primary employer is responsible for giving required [FMLA] notices to its employees, providing FMLA leave, and maintain[ing] . . . health benefits." *Id.* § 825.106(c). And it is the primary employer, not a secondary employer, that is accountable for job restoration following a covered absence, with one narrow, unrelated exception for employees of temporary placement agencies. *See* § 825.106(e); *see also Quintana v. City of Alexandria*, 692 F. App'x 122, 126 (4th Cir. 2017); *Cuellar v. Keppel Amfels, L.L.C.*, 731 F.3d 342, 346–48 (5th Cir. 2013).

Here, the facts do not permit a reasonable inference that the County was DiPaola's primary employer. Whether an employer is primary turns on factors akin to several of those in *Butler*— namely, the employer's "authority/responsibility to hire and fire, assign/place the employee, make payroll, and provide employment benefits." 29 C.F.R. § 825.106(c); *see also Quintana*, 692 F. App'x at 126; *Grace v. USCAR*, 521 F.3d 655, 668 (6th Cir. 2008). Taking DiPaola's allegations as true, all factors point to Aramark. Again, actions DiPaola attributes to Aramark include her hiring, (*see* ECF No. 1-1 at ¶ 14); her promotion, along with the definition of her general duties, (*id.* at ¶¶ 30, 34–35, 38); her placement at the CCDC, as well as later attempts to move her elsewhere, (*id.* at ¶¶ 77, 79, 85); the provision of her paycheck, (*id.* at ¶¶ 41, 46); and the administration of her benefits and leave, (*see id.* at ¶¶ 37, 53–54, 58–60)—in other words, every factor enunciated in § 825.106(c). DiPaola pleads no facts about the County that would offset this result.

DiPaola's other submissions also foreclose any inference that the County's relationship was anything but secondary. In her brief opposing the present Motion, DiPaola states both that "the County colluded with its contractor—and Ms. DiPaola's *primary employer*—Aramark," (ECF No. 17 at 2 (emphasis added)), and that "the Complaint sufficiently alleges the County acted as Ms. DiPaola's *secondary employer*," (*id.* at 8–9 (emphasis added)). The Court is not required simply to ignore DiPaola's statements about the meaning of her own pleadings, even under Rule 12(b)(6). *See, e.g., Pegram v. Herdrich*, 530 U.S. 211, 230 n.10 (2000) ("Though this case involves a motion to dismiss under [Rule] 12(b)(6), and the complaint should therefore be construed generously, we may use [Plaintiff's] brief to clarify allegations in her complaint whose meaning is unclear."). Nor is this a situation in which DiPaola has pled conflicting facts in the alternative, *see, e.g., Quintana*, 692 F. App'x at 126 n.2, which the Federal Rules expressly permit, *see* Fed. R. Civ. P. 8(d)(2)–(3). DiPaola's brief merely reaffirms the conclusion the Court draws

from her Complaint alone: taken in their most favorable light, the facts do not permit a reasonable inference that the County was DiPaola's primary employer.

Because DiPaola has not sufficiently alleged that the County was her primary employer, she cannot seek to hold it accountable on a theory unique to employers of that type. And because this issue is dispositive as to the failure-to-restore claim, the Court need not consider how the County's other two arguments might apply to the same. Accordingly, as against the County, DiPaola's failure-to-restore claim (Count VII) will be dismissed without prejudice.

### B.   Retaliation (Count VIII)

The Court considers each of the County's three arguments as it pertains to DiPaola's retaliation claim. Because these arguments are unavailing under the permissive Rule 12(b)(6) standard, the Court will deny the County's Motion with respect to that claim (Count VIII).

> 1.   For Purposes of DiPaola's Retaliation Claim, DiPaola's Factual Allegations Permit a Reasonable Inference that the County was Her Employer in All Material Respects.

First, the Court again considers the County's argument from a lack of any relevant employment relationship. (*See* ECF No. 14-1 at 3.) As to DiPaola's retaliation claim, the Court disagrees.

Unlike failure-to-restore claims, employees may bring retaliation claims against both primary and secondary employers. All joint employers covered under the FMLA, whether primary or secondary, are "responsible for compliance with the prohibited acts provisions [of the FMLA] with respect to [their] jointly employed employees." *See* 29 C.F.R. § 825.106(e). The prohibited-acts provisions, in turn, bar employers from "discharg[ing] or in any other manner discriminat[ing] against any individual for opposing any practice made unlawful" under the Act. 29 U.S.C. § 2615(a)(2). Prohibited discrimination includes retaliating against those who take protected

11

medical leave or otherwise exercise their FMLA rights. *See Yashenko v. Harrah's NC Casino Co.*, 446 F.3d 541, 546 (4th Cir. 2006).

As discussed above, the pleadings permit a reasonable inference that the County was DiPaola's joint employer. *See supra* Section III.A.1. And for purposes of the retaliation claim, that is enough to defeat the County's argument that it lacks a relevant employment relationship.

### 2. The County's Argument that DiPaola Failed to Allege FMLA Liability Rests on an Uncharitable Reading of Her Complaint.

Second, the County asserts that, as alleged, the April 22 email "could not [have] cause[d] Aramark's decision to relocate" DiPaola to a different facility. (ECF No. 14-1 at 3.) Again, the Court disagrees.

Rule 12(b)(6) requires the Court to decide whether DiPaola's allegations permit a reasonable inference of liability on the part of the County. *Iqbal*, 556 U.S. at 678. As discussed elsewhere, this demands a reasonable inference that each of several relevant threshold conditions is satisfied. *See, e.g.*, *supra* Sections III.A, .B.1 (whether, and to what extent, the County was DiPaola's employer); *infra* Section III.B.3 (whether the County was responsible for the acts alleged); *see also Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). It also demands a reasonable inference as to each element of DiPaola's retaliation claim. *See Walters v. McMahen*, 684 F.3d 435, 439 (4th Cir. 2012).

To plead a prima facie case for retaliation under the FMLA, DiPaola must allege facts permitting reasonable inferences that (1) she had engaged in protected activity, (2) the County took adverse action against her, and (3) the County's action was causally connected to DiPaola's protected activity. *Yashenko*, 446 F.3d at 550–51. The burden for pleading these elements "is not onerous." *Townes v. Md. Dep't of Juvenile Servs.*, Civ. No. JKB-15-1093, 2015 WL 5928114, at *5 (D. Md. Oct. 8, 2015). The Court is persuaded that DiPaola has sufficiently pled both the protected-activity element, (*see* ECF No. 1-1 at ¶¶ 52–59 (describing DiPaola's medical leave for

surgery and post-operation recovery); *id.* at ¶ 87 (noting that DiPaola approached human resources to complain about her rebuffed attempts to return to work)), and the causal-connection element, (*see id.* at ¶¶ 88–96, 183 (alleging that the County was aware of DiPaola's medical leave and that it acted only in response to the same)).

The County contends, in essence, that DiPaola has not adequately pled the adverse-action element. More specifically, it observes that each of the adverse actions DiPaola alleges—the solicitation of her replacement, the refusal to return her to her prior position, and the insistence that she relocate to a different facility, all to punish her for taking medical leave and otherwise asserting her rights under the FMLA, (*see* ECF No. 1-1 at ¶¶ 66–67, 77–79, 85–88, 182–83)—are actions she attributes only to Aramark, not to the County. (*See* ECF No. 14-1 at 3.) It then argues that the sole action DiPaola attributes to the County—the April 22 email—cannot plausibly have caused Aramark's alleged actions, all of which long predated that communication. (*See id.*; *see also* ECF No. 18 at 1 ("[T]he Complaint[,] fairly read, alleges that the County colluded in a cover up to provide post-hoc justification for a decision that Aramark had already made; not that the County was the decider.").)

The Court is not convinced. Taking DiPaola's allegations as true, as the Court must, at least some of Aramark's allegedly retaliatory conduct—namely, its refusal to restore DiPaola to her pre-leave position—continued after April 22. (*See* ECF No. 1-1 at ¶¶ 97–99.) And even if the County is correct that Aramark had by then already started down its purportedly retaliatory path, reading the Complaint in the light most favorable to DiPaola requires the Court to credit the possibility that, were it not for the County's email, Aramark would have changed course. (*See, e.g., id.* at ¶ 91 (alleging that, as of April 22, the County "did not wish for Ms. DiPaola to return to the CCDC"); *id.* at ¶ 172 ("[O]n or around April 22, 2022, [the County] requested that Aramark not permit Ms. DiPaola's return to the facility.").) The Court must also credit the possibility that,

in reaching out to the County, Aramark was seeking permission to retaliate against DiPaola for her most immediately prior act: complaining to Aramark's human resources officer. (*See id.* at ¶¶ 87–88, 95.) Finally, DiPaola suggests that the email represents not the whole of the County's unlawful conduct, but rather the culmination of long-running discussions between the County and Aramark about how to deal with her. (*See id.* at ¶ 183 (alleging that, "[a]s early as January of 2022, Defendants intended to punish Ms. DiPaola for her need to take an extended leave of absence"); *see also id.* at ¶¶ 90, 165, 181 (describing Aramark's practice of sharing information with the County).)

Accordingly, DiPaola has adequately pled each element of her retaliation claim. And because the Court may not adopt the County's cramped reading of DiPaola's pleadings, it need not address the County's additional contention: that merely helping to conceal another's retaliatory act, without more, does not add up to retaliation under the FMLA. (*See* ECF No. 14-1 at 3.)

> 3.     The County's Allegation that the Sheriff's Office Sent the April 22 Email
> Impermissibly Asks the Court to Consider Facts Outside the Pleadings.

Finally, the Court considers the County's assertion that it is it is not the proper defendant, given that the Cecil County Sheriff's Office—a state entity, not a county one—sent the email underlying DiPaola's claims. (*See* ECF No. 14-1 at 3.) Again, the Court rejects the argument.

To survive a motion to dismiss, a plaintiff's allegations need not in fact be true, nor even more believable than not. *See Twombly*, 550 U.S. at 555; *see also Neitzke v. Williams*, 490 U.S. 319, 327 (1989) ("Rule 12(b)(6) does not countenance . . . dismissals based on a judge's disbelief of a complaint's factual allegations."). "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims. Indeed[,] it may appear on the face of the pleadings that a recovery is very remote and unlikely[,] but that is not the test." *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974).

This principle applies even when a defendant introduces new facts that purport to disprove the plaintiff's own. *See United States ex rel. Tusco, Inc. v. Clark Constr. Grp.*, 235 F. Supp. 3d 745, 754 (D. Md. 2016) ("[A] court does not ordinarily accept as true, much less as dispositive, the factual contentions a defendant makes in response [to a complaint]." (citing *Twombly*, 550 U.S. at 555)). For the Court to hold otherwise would be to decide a fundamentally factual dispute well before either party has had a meaningful opportunity to investigate and test the other's allegations in discovery. *See Scheuer*, 416 U.S. at 236; *Greater Balt. Ctr. for Pregnancy Concerns, Inc., v. Mayor & City Council of Balt.*, 721 F.3d 264, 280–81 (4th Cir. 2013). At this early stage, it is only DiPaola's factual assertions that matter—not the County's.

In the brief supporting its Motion, the County argues that "no County employees were involved in any alleged April 22,[ ]2022, email." (ECF No. 14-1 at 3.) Rather, it asserts, "[t]he Cecil County Detention Center is run by the Sheriff of Cecil County[,] who is a State Constitutional officer, not a County employee." (*Id.* at 3–4.) The County further develops this theory in its Reply brief, stating that "[t]he person who sent the email referred to in the Complaint that [DiPaola] attributes to the County is a deputy sheriff within the definition of 'State Personnel[.']" (ECF No. 18 at 2 n.1.)

These are factual allegations beyond what DiPaola pled in her Complaint. It is true that the Sheriff's Office is a creature of the State, not the County. *See, e.g.*, *Ledergerber v. Blubaugh*, Civ. No. JKB-20-1208, 2020 WL 7029868, at *4 (D. Md. Nov. 30, 2020) (citing *Rucker v. Harford County*, 558 A.2d 399, 402 (Md. 1989)). And if the Sheriff's Office is in fact responsible for sending the April 22 email—the only causal act DiPaola expressly attributes to the County, and the lone act from which her claims of collusion derive, (*see* ECF No. 1-1 at ¶¶ 94–95)—then the County may well be correct about not being a proper defendant for the FMLA claims, at least on the other facts DiPaola has alleged. *See, e.g.*, *Kronk v. Carroll County*, Civ. No. L-11-0277, 2012

WL 245059, at *4 (D. Md. Jan. 25, 2012).  *But cf. Ensor v. Jenkins*, Civ. No. ELH-20-1266, 2021

WL 1139760, at *43 & n.18 (D. Md. Mar. 25, 2021) (describing, for purposes of Title VII claim,

the complexity of sheriff's office–county relationships in Maryland).  But the present Motion is

not the proper vehicle for determining this factual contest, something even the County appears to

acknowledge in its Reply brief.  (*See* ECF No. 18 at 2 n.1 ("If the case is not dismissed in

conjunction with the pending Motion to Dismiss on other grounds, the County will file a Motion

for Summary Judgment directed to this issue.").)

At bottom, Rule 12(b)(6) requires the Court to take DiPaola's facts as true.  *Iqbal*, 556 U.S.

at 678.  For purposes of this Motion, then, the *County*, not the Sheriff's Office, sent the April 22

email, (ECF No. 1-1 at ¶ 91), and the Court will not consider the County's allegations to the

contrary.[5]  As a result, the Court has no basis to hold that either the Sheriff's Office or the State is

a proper defendant, much less that the County is an improper one.

## IV.  CONCLUSION

For the foregoing reasons, the Court will grant in part and deny in part the County's Motion

to Dismiss.  The Motion will be granted insofar as it seeks dismissal of DiPaola's failure-to-restore

claim (Count VII) against the County.  That claim will be dismissed without prejudice.  The Motion

will be denied insofar as it seeks dismissal of DiPaola's retaliation claim (Count VIII).

A separate order will issue to effectuate the Court's decision.

---

[5] Under Rule 12(d), the Court may, but need not, convert the Motion to one for summary judgment by considering the facts introduced therein.  *See* Fed. R. Civ. P. 12(d) (requiring conversion upon consideration of "matters outside the pleadings . . . presented to *and not excluded by* the court" (emphasis added)).  But the Court declines to do so here, not least because it is doubtful the conditions precedent to a proper Rule 12(d) conversion have been satisfied.  *See Greater Balt. Ctr. for Pregnancy Concerns, Inc.*, 721 F.3d at 281 (requiring "some indication by the court that it is treating the 12(b)(6) motion as a motion for summary judgment" as well as "a reasonable opportunity for discovery" on the facts being considered).

DATED this ⁄9 day of September, 2024.

BY THE COURT:

James K. Bredar
United States District Judge